Joseph N. PETRAZZULO, Eugene Laski and Arthur Sohnen, individually and on behalf of other members of the International Organization of Masters, Mates & Pilots, AFL–CIO, Plaintiffs,

v.

Robert J. LOWEN, Allen C. Scott, Lloyd M. Martin, Henri L. Nereaux, Orion A. Larson, Francis E. Kyser, Ernest V. Warhurst, Harry Walton, Robert Polumbo, John Craddock, Charlie Jess and Cecil Mayes, individually and as officers of the International Organization of Masters, Mates & Pilots or the Offshore Membership Group thereof, or as members or alternate members of the Ballot Committee thereof, and International Organization of Masters, Mates & Pilots, AFL–CIO, Defendants.

No. 81 Civ. 6024 (KTD).

United States District Court, S. D. New York.

Jan. 12, 1982.

David P. Howe, New York City, for plaintiffs.

Waldman & Waldman, New York City, for defendants; Burton M. Epstein, New York City, of counsel.

## MEMORANDUM AND ORDER

KEVIN THOMAS DUFFY, District Judge.

Select members of the Offshore Membership Group of the International Organization of Masters, Mates & Pilots, AFL–CIO ["IOMMP"] seek to enjoin the defendant IOMMP Union from enacting four propositions approved in a recent union referendum. The referendum was presented to

the IOMMP union membership on July 29, 1981. September 30, 1981 was designated as the date to count ballots submitted on this referendum.

On September 29, 1981, plaintiffs came before this court by Order to Show Cause seeking a temporary restraining order and a preliminary injunction. Plaintiffs allege that propositions 3, 4, 5 and 6 on the ballot are void due to improper conduct by the IOMMP and therefore plaintiffs request that this court prohibit the counting of the ballots and further prohibit the IOMMP from effecting any changes presented in the contested ballots.[1] A hearing was held on September 30, 1980. An order was signed on October 1, 1981 prohibiting any transfer of assets pursuant to proposition 6 until a judgment by this court was issued.

The Offshore Membership Division of the IOMMP, now labelled the Offshore Membership Group, to which plaintiffs belong was merged into the IOMMP by a 1977 Constitution. This constitution provided that the assets of the Offshore Division, which total close to two million dollars, would be segregated from the International Union Treasury for a period of five years. Art. XIV, Section 4. The constitution also provides a dues structure for its membership and delineates the powers of the International President. Plaintiffs contend that the four challenged propositions constitute amendments to the 1977 constitution. All amendments to the constitution must be approved by "(1) a two-thirds' majority *pro rata* vote in a Regular, Special or Constitutional Convention; and (2) approved by a majority vote of the membership voting in a secret referendum ballot." Art. X, Section 1. Defendants concede that only the latter condition has been fulfilled, but assert that none of the propositions are amendments and therefore any majority vote of the membership constitutes ratification.[2]

## I. JURISDICTION

The IOMMP Constitution provides in relevant part:

d) Every member shall have the right to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the Organization or its Officers are named as defendants or respondents in such action or proceeding.

\* \* \* \* \* \*

However, every member shall be required to exhaust *reasonable hearing procedures* (but not to exceed a four-month lapse of time) within the Organization before instituting legal or administrative proceedings against the Organization or any Officer thereof.

Art. III, Section 4. (emphasis added). Defendants argue that this section prohibits plaintiffs from institution of the instant lawsuit. The plaintiffs did unsuccessfully present their arguments in opposition to the proposed referenda to the IOMMP Ballot Committee (Transcript, p. 11). No appeal to the General Executive Board ["GEB"] was ever filed, although the plaintiffs were notified that the GEB meeting would take place on October 5, 1981 in Linthicum Heights, Maryland (Affidavit of Lloyd M. Martin, Exhibit G).

■ The Labor Management Reporting and Disclosure Act, 29 U.S.C. § 401 *et seq.*, (1976 & Supp. III 1979), ["LMRDA"] allows unions to include exhaustion requirements within their constitutions. 29 U.S.C. § 411(a)(4) (1976). Unions, however, cannot force their membership to abide by any exhaustion provisos. *Giordani v. Upholsterers International Union*, 403 F.2d 85, 88 (2d Cir. 1968). This court is empowered with the discretion to require exhaustion when the facts presented so merit. *Johnson v. General Motors*, 641 F.2d 1075, 1078 (2d Cir. 1981); *Detroy v. American Guild of Variety Artists*, 286 F.2d 75 (2d Cir.), *cert. denied*, 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388

---

1. The ballots were in fact counted on September 30, 1981. Accordingly, this aspect of plaintiffs' motion is moot.

2. Proposition 6, dealing with the Offshore Membership assets, was only voted on by Offshore members.

(1961). At the same time, this court must respect the union's desire to settle their internal disputes free from judicial interference. *Johnson*, 461 F.2d at 1079.

■ Plaintiffs are required pursuant to the IOMMP Constitution to exhaust "reasonable hearing procedures" in connection with their grievances. Failure to appeal to the GEB is not unreasonable under the circumstances. The ballots at issue were approved by the GEB on July 28, 1981. (Order to Show Cause and Temporary Restraining Order, Exhibit 1). The law does not compel plaintiffs to perform a futile act. The plaintiffs had made numerous complaints to the union in regard to these ballots and voiced numerous requests for financial information they deemed necessary to cast an educated vote. All these requests were rebuffed. It seems unlikely that the same committee which approved the ballots would subsequently reverse their position. The GEB is comprised of officials of the same union which out of hand refused to honor plaintiffs' requests.

The union has failed to demonstrate that the plaintiffs' appeal option was "(1) adequate; (2) not futile; and (3) reasonable under the circumstances." *Johnson*, 641 F.2d at 1083. Thus, I am constrained to exercise jurisdiction over the instant case and proceed to resolution of the outstanding preliminary injunction motion.

## II. PRELIMINARY INJUNCTION

Issuance of a preliminary injunction in the Second Circuit requires

\*   \*   \*   \*   \*   \*

showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979); *cf. Whelan v. Colgan*, 602 F.2d 1060, 1062 (2d Cir. 1979) (this standard applies with equal force to cases arising under the labor laws).

In order for plaintiff to satisfy this test, some degree of irreparable harm must be shown.

### 1. *Irreparable Harm*

■ Irreparable harm will naturally flow to all union members who exercised their right to vote on the desegregation of assets without all pertinent financial information. Once the money is released from the segregated fund in accordance with proposition 6 it is immediately expendable by the IOMMP and the Offshore Membership Group will automatically lose its control over the money. This constitutes irreparable harm.

However, propositions 3, 4 and 5 do not pose a threat of irreparable harm. If, after a determination on the merits, the ballot is in fact deemed to contravene the extant constitution so as to require a repeat referendum any possible harm can be rectified. An imposition of a new dues structure or a continuation or extension of the International President's authority can be later rescinded without irremediable damage to the plaintiffs. Absent the requisite showing of irreparable harm, the motion for preliminary injunction as to propositions 3, 4 and 5 must be denied.

### 2. *Likelihood of Success on the Merits*

■ Defendants contend that plaintiffs' failure to cite the violation of a specific federal statute *per se* renders the likelihood of plaintiffs' success minimal. If sufficient facts are presented to grant this court jurisdiction under the LMRDA, then no provision need be specifically pleaded. *Aguirre v. Automotive Teamsters*, 633 F.2d 168, 174 (9th Cir. 1980).

■ The defendants herein failed to file the LM–2 financial report of the union by March 31, 1981, the statutory deadline. The union is required to submit such an annual report pursuant to 29 U.S.C. § 431. The union members were therefore deprived of their equal rights to vote in violation of Section 101(a)(1) of the LMRDA 29 U.S.C. § 411(a)(1). *See Bunz v. Moving Picture Machine Operators' Protective Union Local 224*, 567 F.2d 1117, 1121 (D.C.Cir. 1977).

The Second Circuit has construed Section 101(a)(1) to encompass more than just discrimination among union members. In *Sheldon v. O'Callaghan*, 497 F.2d 1276 (2d Cir.), *cert. denied*, 419 U.S. 1090, 95 S.Ct. 681, 42 L.Ed.2d 682 (1974) the court held that Section 101(a)(1) was violated by the IOMMP's union leadership's refusal to provide membership lists to plaintiffs attempting to promote a position contrary to the proposed referendum. The *Sheldon* court heeded the words of Judge Lumbard, who in *Navarro v. Gannon*, 385 F.2d 512, 518 (2d Cir. 1967), *cert. denied*, 390 U.S. 989, 88 S.Ct. 1184, 19 L.Ed.2d 1294 (1968), stated the purpose of the LMRDA as follows:

The LMRDA was enacted with the clear purpose of assuring "the full and active participation by the rank and file in the affairs of the union." *American Federation of Musicians v. Wittstein*, 379 U.S. 171, 182–183, 85 S.Ct. 300, 307, 13 L.Ed.2d 214 (1964). The Congress by passing a "Bill of Rights" for union members determined that the efficiency of a monolithic union under autocratic rule was gained at too great a price if it necessitated any sacrifice in the members' rights to determine the course of their organization. The balance was struck in favor of union democracy. Only a union responsive to the rights of all its members can achieve the ideals of responsibility, opportunity and self-determination that are recognized as fundamental values in the labor movement.

■ A union democracy cannot function effectively if members are not adequately informed of pertinent matters regarding an upcoming referendum. Defendants contend that the overwhelming passage of the propositions is proof of the membership's abiding support. However, proposition 6 passed by only a slim margin, *see* Court

Exhibit 1, and a financial report could certainly have affected the outcome of this vote.

Plaintiffs have presented a strong case under Section 101(a)(1). The facts might also support a breach of the judicially created doctrine of fair representation whereby "unions are obligated to fully represent the interests of their individual members." *Aguirre, supra* at 171 n.5; *see Vaca v. Sipes*, 386 U.S. 171, 181, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967). The plaintiffs, therefore, are likely to succeed on the merits in their challenge of proposition 6.[3] The additional finding of irreparable harm if the desegregation of assets is permitted warrants the issuance of a preliminary injunction only as to proposition 6.

■ Plaintiffs also seek an accounting of the $800,000 removed from the segregated assets of the Offshore Membership Group by referendum in 1979. The union leadership owes a fiduciary duty to its membership, 29 U.S.C. § 501, and that duty encompasses the membership's right to an accounting especially where, as in the instant case, defendants have refused to explain the expenditures of union assets. *See Morrissey v. Curran*, 302 F.Supp. 32 (S.D.N.Y.1969), *aff'd in part and rev'd in part*, 423 F.2d 393 (2d Cir.), *cert. denied*, 399 U.S. 928, 91 S.Ct. 2245, 26 L.Ed.2d 796 (1970). The union cannot hold a fair referendum for desegregation of all remaining Offshore Membership assets until the membership is apprised of the exact uses of the $800,000 withdrawn two years ago.

The preliminary injunction will issue so that plaintiffs are afforded an accounting and a new referendum on proposition 6 is held in accordance with the IOMMP Constitution.[4]

SO ORDERED.

---

3. Plaintiffs argue that proposition 6 is an amendment requiring different voting requirements and procedures than those followed here. Alternatively, even if proposition 6 is not deemed an amendment, the union's failure to disclose financial information voids the election.

4. Plaintiffs argue that the appointment of Mr. Burton Turkus as the impartial balloting agency violated Article X of the Constitution. However, Article X does not specify the size of the Impartial Balloting Agency.

The ballots in question were sent directly to the Marine Midland Bank and were sealed until counted. Plaintiffs have not presented evi-

dence manifesting any irregular conduct by either the impartial balloting agency or the International Ballot Committee warranting the rejection of the referendum.